## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

CALVIN W. TOOLES v. GUY M. BRUNK, TRADING AS SOUTHWEST REALTY COMPANY.

March 5, 1962.

Record No. 5376.

Present, All the Justices.

*William J. McGhee* (*William R. L. Craft, Jr., on brief*), for the plaintiff in error.

*James C. Turk* (*Bentley Hite; Dalton, Poff & Turk*, on brief), for the defendant in error.

EGGLESTON, C. J., delivered the opinion of the court.

Guy M. Brunk, a real estate broker, brought this action against Calvin W. Tooles to recover the sum of $575 for a commission alleged to be due under a listing agreement for the sale of certain property owned by Tooles. There was a trial by a jury which re-

sulted in a verdict and judgment in favor of the plaintiff, Brunk, for the amount claimed. We granted the defendant, Tooles, a writ of error, and the main question presented is whether the evidence is sufficient to sustain the verdict and judgment complained of.

In June, 1960, Tooles, a professor at the Virginia Polytechnic Institute at Blacksburg, having made a connection with another college, verbally listed his Blacksburg residence for sale with Thomas J. Pierce, a local real estate broker. During the summer Pierce interested a representative of the Virginia Polytechnic Institute Athletic Association in buying the property for $11,000 cash, but was unable to get a firm offer from him until September 1.

In the meantime, on August 15, Tooles had signed a written contract listing the property for sale with Guy M. Brunk, trading as Southwest Realty Company, also a local real estate broker. The material part of that contract reads as follows:

"Aug. 15, 1960

"GUY M. BRUNK

" T/A Southwest Realty Company

"You are authorized to negotiate for the sale of the following real property ............. 5-Room House............ at the price of $11,500, payable approx. $7,000 G.I. at $63.00 mo. (at 4½%) Cash; balance ........ or cash ........

"In the event you find a customer who is ready, able and willing to purchase said property at the price and terms stated, or such terms and price as are satisfactory to me, I, or We, will make, execute and deliver to purchaser a warranty deed, on or before ........... day of .............., 19.., and pay to you a commission equal to 5% of the purchase price."

Brunk noted on the contract, in pencil, that the property had also been listed for sale with Pierce.

W. C. Loop, an agent or employer of Brunk, showed the property to Gary F. Krause who agreed to buy it for $11,500. Accordingly, Loop prepared a written contract of sale, dated August 30, whereby Tooles and wife agreed to sell and Krause agreed to buy the property for $11,500, $400 of which was to be paid in cash and the balance on the delivery of a deed. The contract contained this further provision: *"This contract is written subject to the party of the second part securing a satisfactory loan."* (Italics supplied.)

Krause executed the contract and deposited with Loop a check for the stipulated down payment of $400. Loop mailed the contract, embodying Krause's offer to purchase the property, to Tooles who was then visiting his mother at Burlington, Vermont. For reasons which will be related, Tooles never signed the contract or accepted the offer of Krause as therein stipulated.

Loop notified Pierce, the other real estate agent with whom the property had been listed, that it had been sold to Krause. He also delivered the keys to the house to Krause who moved some of his belongings into the basement.

On September 1 Pierce telegraphed Tooles at the latter's Vermont address: "Athletic Association agrees to buy house for cash. Need answer since Loop advises he sent a contract for sale on FHA basis." However, Tooles left Vermont on his return trip to Blacksburg before receiving either the contract executed by Krause or the telegram from Pierce. On September 3, after Tooles had reached Blacksburg, he received from his mother by mail both the contract and telegram.

On the latter date Tooles went to Loop's office and expressed concern as to what he should do, saying, "I have two offers to buy the house." According to Loop, he replied, "Mr. Tooles, you do not have two offers. You have one offer, and I have sold your house. Mr. Krause is ready to take it and pay cash when you deliver a deed." Loop further testified that Tooles then said, "Well, I believe I will go through with the matter," and left.

Tooles denied that Loop submitted a cash offer which he (Tooles) agreed to accept. On the contrary, he said, Loop submitted no offer other than that set forth in the contract signed by Krause; that he told Loop that he would not sign that contract, and "had decided to take the cash offer" of the Athletic Association. On September 7 Tooles conveyed the property to the Athletic Association and shortly thereafter the present suit was brought.

We agree with the contention of the defendant, Tooles, that under the circumstances related he was not obligated to pay the commission claimed by the plaintiff, Brunk. According to the contract the property was listed for sale "at the price of $11,500, payable approx. $7,000 G.I. at $63.00 mo. (at 4½%) Cash; balance or cash." The contract also provided that, "In the event you find a customer who is ready, able and willing to purchase said property at the price and terms stated, or such terms and price as are satisfactory to me, I * * *

will * * * pay to you a commission equal to 5% of the purchase price." Clearly, then, the broker's right to a commission and the owner's obligation to pay it were conditioned upon the broker's finding a customer who was ready, able and willing to buy the listed property upon the stated terms, "or such terms and price as are satisfactory to" the owner.

The offer of Krause, embodied in the written contract signed by him, expressly stated that it was "subject to the party of the second part securing a satisfactory loan." The listing agreement carried no such condition. Therefore, since this offer was not in accordance with the terms under which the property had been listed for sale, and the condition imposed by Krause was not "satisfactory" to Tooles, the latter had the right to reject it, as he did, and accept the offer of the Athletic Association.

Moreover, since the broker's right to a commission was expressly conditioned upon his procuring a customer who was ready, able and willing to purchase the property "at the price and terms stated, or such terms and price as are satisfactory to" the owner, Tooles, and the conditional written offer of Krause did not meet this requirement, the broker was not entitled to recover a commission.

The controlling principles are clearly expressed in the recent case of *Rotella* v. *Lange*, 202 Va. 575, 118 S. E. 2d 516. There the owner listed property for sale with a broker at a stated cash price. The broker produced a purchaser who offered to pay the required price provided he "could obtain an A.B.C. license, a health permit and a five-year lease on the building." We held that the owner had the right to reject this conditional offer and that the broker was not entitled to recover the agreed commission. We there said:

"If the broker makes a special contract, such as expressly making the payment of commission depend upon paying a certain price for the property, or upon securing certain terms of sale, he cannot recover [a] commission if he fails to perform that special contract. To entitle him to his commission he must succeed, and he takes the entire risk of failure, for his reward comes only as a consequence of his success." 202 Va., at page 577, 118 S. E. 2d, at page 518.

The plaintiff, realizing the weakness of his position based on the written offer of Krause, undertook to prove that Loop, acting for Krause, submitted to Tooles a verbal offer to buy the property at $11,500 cash, which Tooles accepted. This contention is entirely without merit.

In the first place, it is at variance with the allegation in the plaintiff's bill of particulars that he was claiming under the written offer of Krause, set forth in "the contract with the said Guy M. Brunk on August 30, 1960."

Aside from this, the evidence is insufficient to sustain the contention that an authorized verbal offer was made. It is true that Loop testified that during his talk with Tooles, on September 3, he (Loop) told Tooles that Krause was "ready to take" the property and "pay cash" upon delivery of a deed and that Tooles agreed to "go through with the matter" on that basis. Tooles denied that Loop made him an offer to buy the property for $11,500 cash, and the record is silent as to why he would have rejected that offer, if made, and accepted the lessor offer of $11,000 cash from the Athletic Association.

But accepting this testimony of Loop as true, there is no evidence that Krause authorized Loop to submit a cash offer to buy the property. Without such authority Loop could not change the terms of the written offer which Krause had submitted. While Krause testified as to how he could have raised the necessary cash, he did not say, nor is there any evidence, that he authorized Loop to submit a cash offer to Tooles in the event his written offer was rejected. Loop testified that after Krause signed the written offer, on August 30, he (Loop) had no further conversation with him. This is in accord with Krause's testimony that on August 31 he left Blacksburg, went to Pennsylvania, and did not return to Virginia until September 9, which was after Tooles had deeded the property to the Athletic Association.

There is no evidence that in the meantime Loop communicated with Krause, by telephone or otherwise, with respect to varying the written offer which he had submitted for the purchase of the property. Consequently, there is no substance to the plaintiff's claim that Loop, on behalf of Krause, submitted a binding verbal offer to Tooles to purchase the property at $11,500 cash.

On the whole our conclusion is that the plaintiff, having failed to procure a purchaser ready, able and willing to buy the property according to the terms of the listing agreement, is not entitled to collect the commission provided for in that agreement.

Accordingly, the judgment under review is reversed and final judgment for the defendant will be entered here.

*Reversed and final judgment.*